The Honorable President of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable United States Court of Appeals for the Fourth Circuit are admonished to call nine and get their attention. The Court is now in session. Godspeed to the United States and the Honorable Court. Move up. Move to your right. May it please the Court. As the Supreme Court today of the injunction strongly signals, the proclamation is fundamentally different than the prior executive order. The proclamation reflects a multi-agency, worldwide review, engagement, and recommendation process, and its substantive findings are that eight countries have inadequate information sharing practices or other risk factors that undermine the visa vetting system and that warrant tailored entry restrictions in order to encourage those countries to improve their practices and to protect this nation until they do so. In light of the fact that the standards for a stay and standards for a preliminary injunction are essentially the same, would you tell me what you think the Supreme Court's action on Monday in issuing the stay, which you saw, what do you think that's going to – how's that going to play on the ultimate resolution of the preliminary injunction in front of us? Well, Your Honor, I think the primary element of a stay, as plaintiffs themselves have heard the Supreme Court in opposing the stay, is that we have to show a likelihood of success on the merits. So we know at a minimum that the Supreme Court thinks we have a likelihood of success on the merits. And I would submit that in these circumstances, where we know in the Supreme Court how they struck the equitable balance last time, the fact that they granted us a complete stay in these circumstances pretty strongly signals that they think that it's more than just a mere likelihood of success. I think that there's a pretty good indication that the fact that they stayed in the injunction across the board – Do you think they're going to stop the preliminary injunction as well? I think that is a strong signal. You can never infer too much from what the Supreme Court means in a stay when they don't get reasoning, but I think that's a pretty strong signal, Your Honor. And I think it's because of the critical procedural and substantive differences between the proclamation and the prior order. In light of those differences, the proclamation falls well within the President's broad statutory and constitutional authority to restrict the entry of aliens abroad. And indeed, the district court actually agreed with us that the proclamation – Even as to Executive Order 2, the Supreme Court, at least early on, let a lot of that stand too. I'm sorry, Your Honor? I said as to Executive Order 2, the Supreme Court let almost all of that stand as well. Well, they stated in part with respect to – The bona fides. For the individuals who didn't have a bona fide, which we do agree would mean that they found that we at least had a likely success even with respect to the second Executive Order. Now, as I was saying, the district – Excuse me, can you pull your microphone just a little or talk a little louder in front of the others? Thank you. The district court actually agreed with us that the proclamation satisfies the requirements of 1182F. And I'd like to begin there, Your Honor, both because – You mentioned the critical differences between the proclamation now and Executive Order 2. Could you delineate for me what you think are the most important critical differences? Yes, Your Honor. And so there are both a procedural component to it and a substantive component to it. On the procedural side, the critical difference is that this involved a multi-agency process where under the Executive Order, the President instructed these agencies to determine what information, if any, they thought was missing from the information provided by – I didn't read the if any into what the President directed be done. He directed that certain countries be bound to be banned. I don't think that's right, Your Honor. If you look at Section 2A of the Executive Order – Not that certain countries, but that which countries should be banned. But if you look at Section 2A of the Executive Order, the exact language, I believe, is that whether there is information that foreign governments are not providing. It didn't say that there is information that's not provided. And it didn't say if any either, correct? That's correct. If any was my gloss on whether, Your Honor. So when the proclamation directs that the Secretary provide a list of countries that would not comply with the requirements of the proclamation, that's not an edict in your mind that there has to be an affirmative list, just that following the review there may be some, many, or none who appear on that list? That's right, Your Honor. And I think that's true for at least three reasons. So the first is, as I said, Section 2A asks to identify whether there was information that was missing. And then Section 2E, when it asks for the list, says appropriate categories of nationals from countries that aren't providing the requested information. So if there were no countries that were not providing the requested information, by definition, the set would be zero. And even if there are countries that are not providing the requested information, it expressly says appropriate categories. And we know that the agencies took that seriously because, for example, Iraq was found to not be providing, to not meet the baseline, and yet the agencies recommended and the President decided not to include Iraq on the list. So we know that this was not some sort of preordained conclusion. We know that the agencies have expressed textual discretion under the EO to make a recommendation to the President of which countries to include. And they exercised that discretion. They didn't just omit, for example, Iraq. And this turns to the substantive part of the differences between the exemptions. On the substantive side, it's a very tailored restriction. They omitted Iraq. They omitted Sudan from the earlier decisions. Even with the countries that they covered, they have exemptions for nonimmigrant visas for several of the countries. Now, in reading the proclamation as I understood it, one of the primary bases or specifications for imposing the ban on these seven countries differentiated by class of visas is the hope and expectation that there will be a change in processes for these nations in improving their information sharing practices. I'm still having trouble seeing how that kind of a bargain chip or coercion is at all a necessary link with respect to a finding that the entry of a whole class of nationals, 150 million plus, would be detrimental to the United States. Can you help me with that? Sure, Your Honor. So I think it is a traditional exercise of the use of 1182-F to determine that when a foreign government is engaged in harmful practices, it can be deemed detrimental to the national interest to allow the country's nationals to enter. That is precisely what, for example, President Carter did with respect to the Iranian hostage crisis. That issue wasn't adjudicated there, right? That is true, Your Honor. But unless this Court was prepared to say that both President Carter's suspension of entry for the Iranian hostage crisis and President Reagan's suspension of entry for all Cuban immigrants during the diplomatic dispute with Cuba were also unlawful. But those are all, I mean, those are all declarations, proclamations of a different order. I mean, this is a wholesale ban of 150 million plus nationals based on the hope and expectation that this will incentivize these nations to cooperate. I just, the connection there to me is missing. Well, just like President Carter restricted all immigrants from Iran from entering because of the hostage crisis, that no one was suggesting that every immigrant from Iran was off-threat at all to the United States, let alone connected to the Iranian hostage crisis. The point of the order was because the Iranian government is engaged in harmful practices, we are going to impose restrictions on the entry of the nationals. And so, too, would— Don't we already have restrictions on entry? I mean, the presumption is if you don't have the sufficient necessary information to enter, you don't get a visa. So, why this additional prophylactic measure? So, we have vetting systems, but the findings that were made by the agencies here is that foreign governments are not providing sufficient information to allow that vetting to occur. So, if that's the case, then the conclusion is the entrant, the national, doesn't enter, right? That is one possible response, but it is not the only response. So, nothing in 1182-F and nothing in the Establishment Clause imposes a sort of narrow, cable-hanging, least restrictive alternative. It is entirely permissible and entirely— Even in the face of a statute that otherwise delineates exceptions for entry that Congress carefully calibrated throughout? I think that's right, Your Honor, because as courts have repeatedly recognized, 1182-F is a recognition by Congress that the President can impose additional restrictions over and above those. So, are they limited at all in time? Can this be done indefinitely as the President has done here? Well, so the statute says for such— Suspended for such period. And I struggled to find a dictionary definition that said a suspension is for an indefinite period of time. Can you explain for us how the indefinite ban that's been imposed here complies with the language of the statute? Not what's been done by other presidents, but how does it meet the statutory grant of authority? Sure, Your Honor. So, the first point is that the statute says for such period, I believe, as he may deem necessary. And in this circumstance, when the problem that has arisen is the countries aren't giving us sufficient information, it is entirely permissible to say that the period will last, potentially, until they correct their information. Okay. But the order doesn't even go that far. Because what the order actually says under Section 4 is that every 180 days the President and the agencies will revisit. But there's no sunset provision. There's no sunset provision. It's in place essentially forever unless he says otherwise. Isn't that correct? Well, no. It's in place until the countries improve their practices or until he decides to change periods. Let me ask you another question. Let's just say that this study contains information, which is likely to be true, that most terrorists or people who commit terrorist acts are men. Could the President then ban all men under the express authority granted by 1182-F? Could he ban the entry of all men until evidence shows further that men are not the ordinary and customary perpetrators of terrorist activities? I don't think so, Your Honor. Why not? Because I don't think that using gender as a proxy would satisfy Mandel's requirements. Okay. Well, then if you're using – if you can't use gender, then there's the question of violating Section 1152. Is that what you're driving at? No. What I was driving at is that under Mandel, the restrictions of entry of aliens abroad have to be for a facially legitimate reason. And engaging in gender discrimination – Well, why isn't it facially legitimate, though? If 99% of terrorist acts are committed by men, aren't we really protecting this country if we just keep out the men? In general, Your Honor, under constitutional law, you can't use forbidden traits as a proxy. You have to target the actual conduct that they're worried about. And nationality is not a proxy target? Nationality is not an invidious classification for the federal government with respect to immigration restrictions. Immigration law is rife with – But you do agree that Section 1152 bans discrimination based on gender and nationality. Only in the context of the issuance of immigrant visas, Your Honor. And that language is critical. If Congress wanted to restrict the ability of the President to keep aliens from entering the country, they would have never used the language in the issuance of immigrant visas. It is clear under the INA that the issuance of the immigrant visa does not entitle anyone to enter the country. You always still have to be admissible. And so if Congress intended to implicitly repeal the President's authority under 1182F to allow the entry, to suspend the entry, they would have never used the language in the issuance of immigrant visas. And this is clear from the legislative history of the language. Can I ask you a question? So in your view, can the President use 1182F to promote or further any foreign policy objectives that he might think acceptable? This one, I guess, arguably is related in the sense that the report talks about the vetting deficiencies with respect to these nations. But if he was unhappy with a nation for some unrelated reason regarding a foreign policy objective, would he then say, I ban these seven or eight nationals from this country in an effort to promote my foreign policy objective? So I think the statutory language is whether it's in the national interest. I think he's trying to accomplish foreign policy objectives. If not at all related to the, at least in this case, related to the improvement of vetting processes, at least arguably related to some immigration-related context. I think that's right, Your Honor. Again, I understand that neither President Carter's Iranian proclamation or President Reagan's Cuban proclamation was challenged. But both of those orders have exactly that feature, that because of foreign policy disputes with the government, the President restricted the entry of immigrants from those countries without any suggestion, any suggestion that the individual nationals who were subjected to that restriction had anything to do with the foreign policy dispute with the government. This case is stronger than that because here, the concern we have with the foreign governments is about their failure to provide us information about the very nationals whose entry we are now restricting. So the case is much, much stronger than the prior historical examples of the use of 1182-F. Counsel, I have a sort of a threshold question, because I want to be sure I understand the justiciability argument that you make. Is that meant to include an argument that the plaintiffs, whether for the statutory claims under 1152 in the APA or the constitutional claim, that they do not have standing in this case? So we have made an Article III rightness argument, Your Honor, but our primary justiciability arguments are focused on non-reviewability, in particular that on the statutory side, statutory claims challenging the exclusion of aliens abroad are not reviewable unless Congress has expressly provided otherwise, and here Congress has not done so, and on the constitutional claims that an alien abroad has no constitutional rights. So are you making a rightness claim or a standing claim that is merging the two? So rightness and standing, as the Supreme Court has recognized, are fairly related, and in this context I think the nature of our rightness objection is also an Article III, in the lack of imminent injury objection. The basic point is that unless and until an individual alien is found otherwise eligible to enter, seeks and is denied a waiver, they are not actually affected by the proclamation. Is it your position that the courts cannot review this proclamation for its validity? No, Your Honor. What I was saying was on the constitutional side our argument is – On the statutory side. Let's take that first. Is it your position that the President can make any finding as a detrimental activity and find that they should be excluded for national interest, and we could not review that? On statutory. Is that your position? That is our position, Your Honor. Could you cite to the case where Congress has stripped off 1331 jurisdiction? So I would point to two cases, Your Honor. First, the Supreme Court decision in Nong v. Shaughnessy, and the D.C. Circuit decision in Sabrina-Bruneau. Both of those cases recognize that when you're talking about a statutory claim, the restriction of aliens abroad, the entry of aliens abroad, is a fundamentally political and foreign policy judgment that is not officially reviewable unless Congress has provided otherwise. And that is clearly the rule when it comes to consular officers. If consular officers restrict the entry of aliens abroad, even by misinterpreting the INA, that is simply not reviewable unless Congress provides otherwise. That should be of no concern. Congress made it clear, even in 1182-F, when they stripped our reviewability, several times, sole discretion, not reviewable. I mean, in other parts of the statute, 1182, but not in F, correct? So I think 1182-F. What? 1182. I think 1182-F's language itself further confirms that it shouldn't be reviewable, because the language is phrased as, if the president finds that it's not in the national interest. By using the phrasing, as the president finds it, it permits it to be reviewed. But if it has to find something, then that means that it's reviewable, doesn't it? I don't think so, Your Honor. Who are the findings for? That's the statutory constraint on what the president has to do. Just as in Webster v. Doe, for example, the government official said – Your Honor, my question is, who are the findings for? It is a substantive constraint on the president. That doesn't mean that it has to be – How is it a constraint, and who reviews that restraint? The president takes an oath of office – I understand that. Who reviews that restraint? It is not traditionally reviewable. That doesn't mean that the president doesn't have to follow it. The president takes – Well, who – where are the teeth that would say he can't? You say the courts can. The third branch of government, we can. Who does? Two things, Your Honor. The first is the teeth – the first and primary teeth is that the president takes an oath of office and has an independent obligation to comply with the Constitution and the laws, one that he takes seriously. The second, I would say, is that Congress – That means on January 20th he had the power because he took the oath of office. I don't think this court should likely suggest that – Likely suggest? I'm just asking. You said the oath of office is January 20th. It started, right? I'm just suggesting, Your Honor. Go to point number two, then. The point number two is that Congress has the ability to review what the president is doing. Remember, we're talking about statutory claims. How does Congress do that? Because if Congress is concerned that the president is violating its statutes, Congress can authorize review. Congress has not authorized review. And the Supreme Court has said – Well, don't we have a problem in the Chada case? We talk about Chada and it talks about Congress can't delegate authority and then decide who's going to be the ones to arbitrate that. Are you saying that they could do that? So they delegate it to the president and then they're the ones who decide whether or not – So Chada did not involve the exclusion of aliens abroad. The exclusion of aliens abroad is a very narrow set of circumstances where the Supreme Court in Knopf v. Shaughnessy recognized unless Congress provides otherwise, there will be no review. And part of the reason for that, Your Honor, unlike in Chada, is there's not a delegation issue because the president has inherent executive authority with respect to the exclusion of aliens abroad. Well, no, the power under INA comes exclusively from congressional power, does it not? That is not correct, Your Honor. If you look at Knopf v. Shaughnessy, this exact argument was made. The Congress has improperly delegated the authority of the president to exclude aliens. And the Supreme Court said that that is not true. The president has inherent executive authority to restrict the entry of aliens abroad. I'll just last off. I know Judge Moss has a question. So you're saying under 1152, which clearly in 1965, it was a policy that we would not discriminate in national discrimination, the president can just say, I don't want to do that. We're going to forget about that and we will, I can have every country excluded. And you say there's no reviewability of that? Is that correct? If the president were to do that, it would not be reviewable. But, again, the president would have to make a finding that it was detrimental to the national interest. That is not what we have here. What we have here is that the president has found that eight countries have specific national security and foreign policy problems. And in response to those problems, he's imposed an entry restriction. It is precisely what President Carter did for Iran. It is precisely what President Reagan did for Cuba. No one even argued that those entry restrictions violated the 1152. No one challenged either of those. That's right, but I would say no. It was under challenge. That is correct, Your Honor, but the fact that no one even bothered to challenge it, I think, strongly signals just how weak the claim is. Those statutes restrict the issuance of immigrant visas. And if you look at the legislative history— I thought that's what you said to make the reason was that it doesn't apply, because it's the issuance of the visas that's not the entry. And in response to Judge Keenan's question on gender, you said, well, gender doesn't apply because it's one of those broader classifications that deals with religious discrimination, much like race. So gender is one that you can't use. Then why would Congress put it in 1152? It sounds like to me it's already covered. Gender and race would already be covered, even with the issuance of visas and entry. So why is it in 1152? Your Honor, so the point I was making to Judge Keenan— My question is, why is it in 1152 if what you say to Judge Keenan, that gender doesn't apply because it's one of those classifications that they just can't do it, because it's one of those invidious classifications, like race? But you can use nationality, because it's not. So my question is, then why have 1152 apply to race and gender? Because you don't need it there. There are a lot of statutes, Your Honor, that prohibit things that are also prohibited. Why is it in 1152? Because Congress is passing a statute that bolsters what the Constitution, at least potentially, in part, also prohibits. But I think the other important point is, 1152 is focusing on the issuance of immigrant visas. What they were trying to do, and I think the legislative history makes this quite clear, is they were trying to wipe out the preexisting national— But you don't need it. You don't need it. You already have it. You already have it. But you gave the answer to Judge Keenan. You already have that, because it's already— Your Honor, if you use gender, you can't use race. Otherwise, you can't. Presidents can do this. They can do it also, in this instance, as Judge Breger has indicated, on this basis, too. Your Honor, there are a lot of statutes that prohibit what the Constitution already prohibits, so I'm not sure why that would undermine the argument that I was making. But under 1152, what the legislative history makes clear is that what Congress was concerned about was a specific issue. It was the national origins quotas. Let me ask one question. I know others want to ask you a question, but I want to make sure I get this question out. As I understand it, there's been a worldwide review, and that is the primary basis on which you think this is really different. That's why, frankly, we should stay. In the face of a worldwide review, which is classified, we don't have it. We simply just know it's there, procedurally. Fine. But then, what do we do when we're looking as an objective, reasonable observer, and we have multiple instances in which this president has indicated before the election, during the election, and just a week or so ago. I believe we can take judicial notice of that. It's in the news. He points the very thing that we say the purpose of this, or at least has indicated the plaintiff's saying the purpose of this proclamation is. What do we do with it? I mean, I'm trying to, in other words, do we just ignore reality and look at the legality to determine how to handle this case? If the reality is that is the purpose, but the legality allows it, does that make a difference? Yeah, so I have several points to that, Your Honor. So the first is we do think that all those statements are legally irrelevant under Mandel, and here's a critical point that's different from when we were here last time. Tell me what you mean, all those statements. You mean I'm talking about statements that go directly to purpose, and if the allegation is that this is an effort to ban Muslims from this country, and every statement that's made by the individual who's the president making it goes to say that, but it is done in a way as to say, well, we did a worldwide review, now it's legal. And what I was saying, Your Honor, is that the Supreme Court, since we were here last time, in the Morales-Santana case, made crystal clear that the Mandel standard is a rational basis review standard, and under rational basis review, subjective purpose is legally irrelevant. When you engage in rational basis review, you do not look to see what was behind the motives. So if it's not a rational basis review, as you say the Supreme Court has said it is, then do we then go back to the reasonable observer and answer the question in that vein? I understand what you say the Supreme Court has said, but tell me what you say on that. So if you blow past the fact that the Supreme Court said rational basis review applies, under McCreary, the question is whether the objective observer would determine that the primary purpose of the proclamation was religious. And I would submit that when you have a multi-agency review where you've got numerous cabinets classified, and that's all we know, that there's been one. We said, okay, there's been one. It's not in this record, right? That report you're talking about, it's not in this record. The report is not in the record. No, we do have it in the record. And notwithstanding how you may classify it, we can take notice of statements that are made. Evidence allows us to do that. We do have that as the direct purpose on the part of the President. Again, Your Honor, the reasonable objective observer would look at the proclamation and what the proclamation says. You don't have the underlying report, but you do have the proclamation, and the reasonable observer would not ignore what the proclamation says. And aren't you saying that the support for the proclamation is in the report? Is the support for the proclamation being rational and not a Muslim ban in the report? It's further detailed in the report. It's also detailed on the face of the proclamation. Courts can look at classified information in a secure manner. Wouldn't it be much easier if you would just have put your support in the record, albeit classified, so that we could see it? Don't count on it, that it would be easier. Your Honor, the issue wasn't just that it was classified, though. The fact that it's classified is part of the reason it's not certainly public. This is also a report that is covered by the Presidential Communications Privilege. It is a recommendation from Cabinet Secretaries to the President that includes incredibly sensitive information, not just because it's classified, also because it contains important foreign policy-related information, including information such as which countries engaged with us and which countries improved their practices during the engagement process. This is all incredibly sensitive information. It's all covered by the Presidential Communications Privilege. Now, that's it. That's what you have to fall back on. You can't get past classification of it. We're article-free judges, and we have clearances for the classified stuff, but the Executive Privilege, you have to assert, and that's never been litigated. That's right, Your Honor. And what I was going to say is— It wasn't asserted in the district court. No. If it wasn't asserted, then that issue is not going to be resolved. That's right, Your Honor. And so if this court—we don't think it's necessary, and we don't think it's appropriate, but if this court were to order us to file the report ex parte and under seal, we would, of course, do so, and you would see that the report strongly supports— You would file the privilege material, too? You wouldn't stand on the privilege? I mean, that's an unusual position if you believe in the privilege. I said if this court were to order us to do so. Well, I understand, but we're of equal branch to the President, and he can determine his privilege, and the question is whether we're going to get into the deliberative process of an executive, which seems to me would be similar to the President asking us, as judges, to give him the deliberate process behind our decisions. Your Honor, I certainly agree that we shouldn't have to disclose this. I think that the fact— But you said you would give it up if we asked you to. If you ordered us to do so, we would. If we ordered you to do it, then we'd have to litigate the executive privilege issue first. Or we wouldn't have to. What's the answer to that? Would we have to litigate the executive privilege issue before you would show it to us ex parte and in camera? Your Honor, I apologize. I'm not sure we've taken a position yet on— You don't have a position on that? On whether the court would only order us if we were the first to serve the executive privilege. If we ordered you to, you'd give it to us publicly. We have clearances just like you do. Every one of us. But you have another point, and it could be a valid point, of executive privilege, deliberative privilege, however you describe it. We understand it. But I thought your answer was if we ordered you to do it, you'd give it to us. But if you want to back off of that, you're perfectly entitled to, because that's the question. Would you, before you give it to us, want to or insist on litigating the deliberative privilege applicability before you turn it over, ex parte and in camera? Your Honor, I apologize. I do not have a position on that. And if it is relevant to this court, we can submit a supplemental filing on whether we would want to stand on the privilege. If I could just follow up on that. You were counsel in the district court, correct? Yes. And when this question came up before the district court, you told the court, if you think what's in the proclamation supports it under the relevant legal standards, then it should be upheld. If you think that what's in the proclamation isn't sufficient to support the relevant legal standards, then it should be invalidated. And so do you stand by that position, or do you have a new position now? Dwight, we do think that if you don't think the proclamation by itself satisfies it, and you don't want to look at the... No, no. There were two sentences. And I'm asking you if you stand by them. And I don't think this requires a long answer. If you think what's in the proclamation supports the relevant legal standards, then it should be upheld. If you think what's in the proclamation isn't sufficient to support the relevant legal standards, then it should be invalidated. That was the case you put to the district court, and I assumed that was the case that you would put here. It is, and we do stand by that now. That's the Mandel principle. We do stand by that. Our law is suggesting that insofar as any of these judges on this court thought that what was critical to their analysis is whether the underlying report... No, but you told us that you live or die by not having it in. I just have one other question, which I also... When the acting Solicitor General was here before, he assisted in telling us how temporary this ban was. It was a brief pause. And that's a difference between the order that we have now and the order that existed then. And it's one that you haven't spoken to, which seems to me to be pretty significant. Well, the reason for the difference is last time it was temporary because it was in service of the study. Right, but the suggestion was that the study was going to make it so that you wouldn't have it in the future. But, in fact, lo and behold, the study said we should do this in an indeterminate amount of time. Well, but not... Critically, only for the countries that were found to have an inadequate information sharing practice... They lined up pretty well, didn't they? So there's overlap, but it's not a perfect overlap. Sudan's not covered. Iraq wasn't covered as it was before under the first order. And Korea, which has what? Iraq was not in the case that was here before. Right, I have to say. Iraq under the first order. Of the other countries that are covered, there are exemptions for the non-immigrant visas. Now, this is certainly true. We're not denying that many of the countries are also covered. But nor should anyone be surprised by the fact that when you're investigating whether countries have inadequate information sharing practices, countries that have been found to be state sponsors of terror or terrorist state agents are likely not going to turn out to do very well in an investigation of whether they started to share the information that we need to engage in visa vetting. Well, nor should we be surprised, I guess, since the president has continued to make statements that some people regard to be anti-Muslim after the issuance of this order, should we be surprised that it might be construed as an anti-Muslim order, right? I don't think that is a fair construction. Construction of what the president said? No, I don't think that's a fair construction of the proclamation. Okay, but I'm asking about the president's statement after the order. Right, and what I'm suggesting, Your Honor, is that the president's statement after the order has mostly said that he wants it to be tougher. And whether it is tougher, it is most certainly not tougher with respect to Muslims. Again, if you look at what countries are covered, they took out Muslim countries, they created exemptions for Muslim countries, they added non-Muslim countries and a single majority Muslim country that is only 52 percent. Well, you have North Korea and Venezuela, but it doesn't apply hardly to anybody. I mean, the other side says that's kind of like window dressing. Again, Your Honor, the point is that so-called non-Muslim country. Right. The president's statements that he wanted it to be tougher, and no one can deconstruct that to be tougher with respect to Muslims because the proclamation simply is not tougher with respect to Muslims. But the other category of the president's statements, the ones that Judge Wynn was asking you about from November 29th, you do agree we can take judicial notice of those, right? Judicial notice? Yes, we don't think it's legally relevant. Did you say you're conceding we can take judicial notice of those? Yes, we do. Yes, of the fact that the statements were made? No, they want to use the content. The plaintiffs want to use the content of those statements, which would never be admissible in trial. They're not official documents. They got speculation, opinion, hearsay, triple hearsay, and you are conceding that we can take judicial notice of that? Your Honor, I thought that Judge Harris, and maybe I misunderstood, was referencing the president's tweets, not the newspaper articles. And it is the department's position, right, that the president's Twitter accounts, those are official statements of the president of the United States. Right. And I assume it is still the department's position. Did you say right in response to her statement just then? Yes, she did. You do concede that those are official statements of the president of the United States. Correct? Yes. Okay. And the Department of Justice still takes the data. Are you conceding that tweets are official statements? Yes, the government is. He said yes. Yes. That's been the government's position in other cases. We have plenty of evidence of that. Did you follow up? Yes, and this is my last one. And it is still the department's position, I take it, that it's the president who speaks for the executive branch, right? We have a unitary executive. There's no constitutional space between the president and DHS. And if there's any dissonance or any gap between the purposes and the motives between the president and a subordinate executive official, I mean, as a court, we can't go behind what the president says, right? We go with what the president says. Insofar as it's legally relevant, yes, Your Honor. Put these statements before the Supreme Court in opposing the say, and these statements didn't dissuade the Supreme Court from saying this injunction, and they shouldn't dissuade this court from reversing the injunction, because they are simply not legally relevant. They're not legally relevant under Mandel, because Mandel's rational basis for review of the Supreme Court— Are they legally relevant under McCreary? We don't think that they are persuasive under McCreary. Relevant but not persuasive? Yeah. Okay. No, actually, Your Honor, sorry, just to clarify. We don't think that—we think that statements about the proclamation would be relevant but not persuasive. The most recent tweets aren't even about the proclamation, so we don't think that they would even be relevant. No, go ahead. So you're suggesting something that while the president may be showing anti-Muslim bias in his tweets, that cannot be taken over into the content of the proclamation? Your Honor, I— The proclamation has to be viewed based on its language and not any manifest anti-Muslim bias as evidenced by the tweets. Is that correct? I don't agree with the characterization of the tweets, but regardless of the characterization of the tweets, we don't think it is legally relevant under either Mandel or McCreary. Let me ask you one other question, just jumping back to the statute. Can the president violate the Immigration and Naturalization Act? It's kind of a global question. Can the president, by terms of his authority under 1182-S, take action contrary to any other provision of the INA? No, it is certainly possible that the president could engage in conduct that would violate some provision of the INA. We're not saying that— Okay, what would be the limiting principle from your perspective then? If the president can ban all immigrants, even though the INA says you can't discriminate against immigrants, if the president could take other actions of a seemingly infinite nature, even though the statute says to ban for a period, can the president potentially say, well, I'm banning all immigrants. I don't want to take any actions. Why couldn't the president, under your theory, violate any particular provision of the INA by making a finding that entry of people pursuant to any other provision of the INA is detrimental to the interests of the United States? So the president has to make a finding, as you suggest, that entry would be detrimental to national interests. Right. One substantive and one sort of procedural. So one point is it can't be directly contrary to some other INA provision. If, for example, the president said, I don't like immigration, I therefore think it's contrary to national interest, I would think that that would be in serious tension with the provisions of the INA authorizing immigrant visas. But critically, that is not what this proclamation does. What this proclamation does is find that there are certain countries that present national security and foreign policy problems, and as a result of that, the president's going to impose additional restrictions. And that sort of order is well within the core of 1182. I would point this forward. I think it's very important to emphasize in the D.C. Circuit's decision in Averesk and the first circuit's decision in INA involved exactly this sort of order, where under the INA, there was a visa inadmissibility ground that required that the alien's activities within the country be harmful. Not just their entry, their activities. Okay, so the president then, I'm just trying to figure the outer limits here. So the president can treat immigrants more harshly than he treats other aliens. Is that correct? Is it correct, excuse me, under 1182-S? If he has a reason why it's detrimental to the national interest. Okay, in the proclamation, he said it's detrimental to the interest of the United States essentially because they have more rights when they get here. That's sufficient to come within the scope of 1182-S? That's true. Not only is that sufficient, that is exactly what the Supreme Court held in sale. In sale, the issue was that if the Haitian immigrants had gone to the shores, they would have had asylum protection. And in order to... Sales essentially said that once they got there, they had to show they had a right to be here. Isn't that correct? No, Your Honor. I think the key point in sale that's responsive to your question is that sale, if the immigrants had gone here, they would have had asylum protections. And precisely in order to prevent them from invoking their asylum protections, the president set up a blockade under 1182-S. And the Supreme Court said that that was clearly authorized. So the mere fact that the president is using 1182-F in a way that would arguably stop aliens from invoking rights that they might otherwise have is not a problem under 1182-S. I'm just getting to the reasoning of the proclamation. I know the president doesn't have to be logical. I agree with you. That's not what I said. And the proclamation can be riddled with logical parts. No more than we have to be logical. Yes, the president doesn't have to be logical. Don't judge us by that, Sam. I agree. But my concern is with regard to immigrants. The president has not said anything in the proclamation as to why immigrants should be treated differently than other aliens coming from the same country. So if you're from a banned country and you just want to be here temporarily, then you're subject to fewer restrictions. And if you're an immigrant from the exact same country, you're banned. And you're saying, well, it doesn't make any sense that the president can do it? No, it's not at all what I said. What I said is that the proclamation explains explicitly why they're drawing that distinction. They're drawing that distinction because immigrants do have greater protections from removal. And so if the problem is that there's insufficient information from these countries and there's a risk that our vetting system is not working and people are getting into the country who we don't want here, that risk is more harmful if we can't remove them on the back end. That is a perfectly rational thing to do. Congress was saying in 1152, immigrants are future Americans. And we're going to give them protections. We're going to say you can't discriminate against people based on nationality. I mean, don't you think that that's a legitimate distinction Congress is drawing with regard to immigrants? As opposed to the random aliens wanting to come in your cities and wanting to go to your universities. These people are future Americans. And we're not going to tolerate discrimination based on nationality. Isn't that a clear expression of congressional intent in 1152? In the issuance of immigrant visas, and the legislative history of this afternoon is crystal clear that what they were trying to stop was national origin quotas where the government was discriminating basically on the basis of ethnicity and race to maintain an ethnic balance. Let me ask you this. Isn't it true that a president is entitled to the greatest area of deference in national security and then double down on national security in international affairs? Is that correct? That's absolutely correct. Then, I want to see how you think that principle of deference works. When a president makes statements, people look at those statements and some would go, clearly it's anti-Muslim. Some would go, if you read them in context, they may never be agreement between the two groups. They don't know. He's talking about what he perceives as some kind of terrorism related in some fashion to some people who are Muslim, the so-called radical Islamic terrorists. If you could look at his statements and each side could find something they would point to, what inference – can he get any inference on what his statements are in light of the deference he's entitled to? Yes, Your Honor, in light of the deference that he's entitled to, and I think almost as important, if not more important, in light of the facial rationality and permissibility of this. No, but I'm talking about – I'm just looking at the statements. I'm just looking at it. I understand on the facial neutrality, but I'm talking about rationality. What I'm asking is, is it pretty clear if people are interested in his statements? On his statements, some go, and it's clear it's different with discrimination. Others go, well, no, if you look at it in context, it's always self-statement. People can look at them differently. But if there is that possibility that people can see him differently in the total context, is there any rule on what inference he would be entitled to under this tremendous deference in this area? Yes, both given the deference that he's due in this particular area as well as the more general deference that court inferences are due, I think you should take the more permissible, more reasonable, more charitable interpretation of what the president did rather than the more hostile one. But especially in this context where we have a proclamation that was recommended by agencies who have no such statements, there's no basis to question the integrity of the officials who made these recommendations. We haven't seen it. We don't know. We haven't seen this report where all this stuff came from. And we previously determined in that other opinion that the DEO2 was made in bad faith because of all the things that have been said. Now you've got more added to it with these last tweets plus a proclamation plus the report, which you don't show us. But the proclamation lays out that the agencies engaged in this process and recommended these eight countries. So unless this court is prepared to say that the president is just lying and that the agencies didn't actually say that and somehow no one is mentioned. We can't look at it to see. We can't look at it. That is true, Your Honor, but this court should not lightly suggest that the president of the United States is just flat lying that the agencies recommended that these eight countries. You keep going. I understand your argument, your position that there's an agency review process that kind of breaks any chain between any concerns anyone might have about the president and what happened here. But I need you to explain to me how a review process by a subordinate executive branch official is an independent act that can cure the pain from presidential statements in a unitary executive system. I mean, DHS is not an independent agency. It's part of the executive branch, and there is no constitutional faith. It's not that the president is over here and DHS is over there. It's all the same thing. DHS is subordinate to the president, so I don't see how this review process can be kind of an intervening independent act. Here's why, Your Honor. Because what you're reviewing is the proclamation. The question is whether, if you reach the maturity state of the analysis, the question is what is the primary purpose of the proclamation. It's signed by the president of the United States. That is true, Your Honor. And he has his statements on the record, official statements of the president of the United States. And although I agree, people always see things differently. Some of those November 29th statements, you know, even with different extraordinary and most favorable to the president, it's a little tricky to find the national security rationale for those. Your Honor, what I would say is, given you've asked how to, why there's the potential, what the relevance is of the agency's recommendations. What I would say is, if this exact recommendation had been made to a different president, and that president had adopted the recommendation, the notion that there would be an establishment clause violation is sensible. There's nothing about either the process or the substance of the proclamation that would even possibly give rise to an establishment clause violation. Well, I understand you think we're not in a query, an establishment clause lane, but if we were, I mean, that is just an entailment of the purpose inquiry under the establishment clause. So it's the same act, the same moment of silence statute, constitutional in one location, unconstitutional in another. So that is a possibility, but neither McCrary nor any other case has ever suggested that when multiple agencies engage in a lengthy deliberative process, make recommendations to the president about national security and foreign policy concerns, when those recommendations are facially neutral about religion, that all of that could be set aside based on earlier statements and statements that don't even pertain to what's the purpose of the proclamation. I think if you just focus on, for example, McCrary. McCrary involved a facially religious practice that, even in the third iteration, had great emphasis on the language in the Ten Commandments that was religious in nature. The other monuments that were put up alongside it didn't really make much sense. The history bolsters the conclusion there, but it didn't drive the conclusion there. Whereas here, without the prior history, there's just no argument that this proclamation would violate the establishment clause. And so I think a much better analogy than McCrary is McGowan. In McGowan, you have a Sunday closing clause that, to that day, said that the purpose of the law was to protect the Sabbath, to avoid profaning the Lord. And the Supreme Court nevertheless held that that didn't violate the establishment clause. And the reason it did, the primary reason, is that the exemptions in that statute revealed that it didn't any longer have a religious purpose, that it was more secular in nature, that it was more about leisure than religion. And what I would submit is that, in this case, the exemptions in the proclamation serve a very similar function. There is no way you can conclude that this is a Muslim ban, but for some reason, they decided to exempt non-immigrants from most of the Muslim countries. That simply just doesn't make any sense if you think it's a Muslim ban. And it makes perfect sense under the rationale the proclamation is actually given, which is that there are problems with the information sharing from these countries. And in order to both deal with the risk of that, but also, just as importantly, to encourage these countries to improve their practices, this precedent adopted tailored restrictions that differ based on countries, based on their recalcitrance and their willingness to cooperate. It makes perfect sense under the rationale given. It makes no sense under the argument. I just want to make sure that we're clear when you responded to Judge King that precedent would have to be flat out lying. I think the position is the precedent is not lying about what he said. He said what he said. We don't think, at least from my perspective, I don't think he's lying at all. If anything, he's the one individual who's saying exactly what he means, notwithstanding Judge Shedd's characterization that it can be read many ways. He seems to be saying it over and over, and he is making it very clear. He seems to be telling the truth about what he actually feels here, not that he's lying. And I think that's the question. If the precedent is telling the truth about what he feels, and notwithstanding that you've got independent worldwide review, which you seem to characterize, they just decided to do it on their own without any impetus whatsoever, but we'll leave it there. If you have that, and if he is telling the truth, and the truth is perceived to be just what he seems to be saying over and over again, how do we look at that in determining? I know you want to look at Mandel in a shell in terms of how it's a rational basis, but in terms of a reasonable observance. Again, Your Honor, the proclamation, given that it is based on the recommendations from the agencies, and if you take as given that he's telling the truth that the agencies did so recommend, that the agencies did engage in this process, that they did find that eight countries have inadequate information-sharing practices or other risk factors that undermine visa vetting, that because of those restrictions, they recommended tailored entry restrictions that are designed to encourage them to improve their practices and to protect this nation until they do so. If you accept all of that as true, what I would submit is these statements, certainly the earlier ones, but also- You accept the statements as being true. The statements are what statements are. No one's disputing that he said- Over and over again. Right, but what I am saying is that those statements, especially the more recent ones, don't speak to the purpose of this proclamation. What this court is reviewing is- And the purpose of this proclamation to deter terrorism, is that the goal of the proclamation? Look, the end objective of the proclamation is to keep this nation safe from terrorism and other national public safety threats. And the President's tweets, you've already conceded, are official statements of the President of the United States, and that they could be subject to charitable interpretation. There was a tweet a month before the proclamation was signed by the President, tweeting a statement that shooting Muslims with bullets dipped in pig blood should be used to deter future terrorism. How am I to take that charitably? Well, so, Your Honor, the first point is that that is not about the proclamation at all, and is not- Oh, it's about deterring future terrorism, which I thought you said was the goal of the proclamation. Is the end goal of the proclamation, but the proclamation is dealing with a specific problem, which is inadequate information sharing. What the President said in that tweet about how to deal with actual terrorists, whatever you think about that, it doesn't suggest any sort of general bias against Muslims. It doesn't suggest that they're going to ban all Muslims because of a fear, and the proclamation says the exact opposite. The proclamation says that there are inadequate information sharing from these eight countries, or other risk factors that undermine these events. And to deal with that problem, a particular aspect of the broader terrorism problem, they are imposing entry restrictions to encourage those countries to improve their practices, and to protect this nation until they do so. All right. Thank you, Your Honor. Thank you, counsel.  Thank you, Your Honor. There are four fatal flaws that doomed EO2. First, in response to Judge Harris's question, the President directed these subordinate agencies to stick with his original architecture for the ban, and that is to use nationality as a proxy for religion. By design, what the President asked these agencies to do stuck with his plan of using nationality. Let me ask this question, the same one I asked to start the other argument. I want you to tell me, in light of the Supreme Court's action to grant the stay on, I think it was Monday, and since the criteria for stay and for preliminary injunction are essentially the same, which you oppose the Supreme Court's action. But I want you to look at that action and tell me what impact do you think that is likely to have on the final resolution of the validity of the preliminary injunction that we have before us? Judge, I don't think that this court can take any substance from the Supreme Court's stay order. The court was very careful. I didn't say substance. I said, and I'm asking you, not this court, but you're saying that you can't take anything from that, any indication at all? I don't think the court can, Your Honor, because the Supreme Court was very careful not to say a word about the merits or the equities. Well, I have the same question as Judge Shed did, and it seems to me that to have granted the stay at all, the court had to find that there was a likelihood of success in the merits. I don't think that's right. Don't say that. I don't think that's right, Judge Motz, just because, as we saw with the Supreme Court's previous stay, that one actually did detail that they were issuing that order based on its view of the equities that were presented on the record there. They did say that. And so I don't think we can assume, as Mr. Mukon suggested, that the Supreme Court in this instance was saying something about the merits. To the contrary. In the normal case, that's the most important fact. Your Honor, it is, but the Supreme Court previously did not address the merits in ruling on a stay related to EO2, and I think that all this court can do is to decide case on the record and on the law as it finds it. That's what the Supreme Court is doing. The Supreme Court followed the traditional process here, and there just omitted the factor about substantial likelihood of success on merits. Judge Agee, we can't tell why the Supreme Court issued the stay. It didn't say it. It did last time. Any type of a stay proceeding or a preliminary injunction. Courts just don't skip that stage. Your Honor, the Supreme Court didn't rule on the merits last time in considering stay of EO2. Well, it did rule on the merits with regard to stay or a preliminary injunction. Judge Agee, all I can say is that this court can simply judge this case as it finds it. That's what the Supreme Court asked both this court and the Ninth Circuit to do. The Supreme Court did tell us and the Ninth Circuit to act as quickly as possible, which suggests that they're interested in whatever we come up with. That's right, Judge Mott, and I would maintain to go back to the reason why. Or it might be they're just interested in us getting done with it and getting something in front of them so they can rule. But, of course, they could have ruled. The Supreme Court can do what it wishes. The Supreme Court will do what it wishes, and it should have the benefit of both this court's ruling and opinions or set of opinions and what the Ninth Circuit does as well. I understand your position is we shouldn't take anything from the fact that the Supreme Court granted the stay. I don't think you can, Your Honor. I don't think you can. The second reason that the new proclamation – You could read between the lines and think that you ought to be asking us to send it back to have the district court rule on the merits and come back up and then have the merits. Well, Judge King, the district court did reach the merits at least on the likelihood of – He dealt with the preliminary injunction. He didn't deal with the permanent injunction. He didn't consolidate under 65 Bay 2 or whatever it is with the merits of the case. And he didn't make a full record and all that stuff. Judge, I think there was – He didn't litigate issues of privilege and things like that. Your Honor, there is more than an adequate record to support Judge Hong's order here. You can reach the statutory issues on which we didn't prevail. And I think there is an adequate record to do that. And the Supreme Court did direct this court and Ninth Circuit to reach a decision with dispatch. And so I think that's what the court should do respectfully. The second reason – Before you get to the second reason, you began by saying that this proclamation continues the practice of a ban and proxy by nationality. But, I mean, this is different in the sense that at least on the face of it, the proclamation began with an assessment not just of the Muslim-majority nations, but all 200-plus nations and then sort of went out its way down to these admittedly fairly similar results with respect to these other prior executive orders. Why doesn't that make a difference in the sense that it did not begin as a proxy by nationality ban? Your Honor, I think the government actually conceded just now that we should not be surprised that we ended up with five of the six countries that were banned under EO2 once again banned under the proclamation. And that's because, Your Honor, even though the President directed this worldwide review of each country, what he did in Section 2E of the EO2 was to say, Give me the list of your countries. And, Your Honor, in the design of the study – Is it your view that he ordained the necessity of a list? He was not going to be satisfied if the Department had come back and said, Can't find anything. That's right, Your Honor. And we know that not just from the face of EO2 and the face of the proclamation itself, which is briefly with references to coming up with a list of countries. We know it because the President said so in official statements continuously. The key example I'll give you is that on March 15th, the day that the EO2 was enjoined by two district courts, the President said two very important things. The first thing he said is, We have a very big problem with Muslims assimilating here in the United States. And the second thing he said is, I want to go back to the original, and I'm going to go all the way. And that statement is one that he's repeated throughout the summer and the fall. And even before the results of the study came out, long before the study was even done, the President said, I'm sticking with my original plan, and that is to use nationality. This goes way back, Your Honor, to what he said right before the election and was confirmed by his advisors right after EO1 issued, that you don't want to talk about Muslims, then I'll talk about territory. And that's exactly the architecture we still have. And its relation to the statute. If I recall, your predecessor in the earlier case suggested that if it were any other President, the EO2 would be fine, would be okay apparently, would satisfy the statute. Is that your position? Your Honor, I think what we said during the last oral argument is that if you didn't have the record of statements, it would be a different case. I agree that is the case. But, Your Honor, we, as Judge Keenan noted in her concurring opinion last time on EO2, there actually is reason to doubt that this is spatially legitimate on its face in its cross-references to EO2 and its internal illogic, which it has in common with EO2. The proclamation says, first of all, we have a problem with the information sharing from these countries. As a result of that, there's such a high risk for nationals of those countries that we're going to ban 150 million people, the vast majority of whom are Muslim, from six predominantly Muslim countries, but we're going to let in a lot of them. But absent the troubling statements, admittedly troubling statements of the President, which continue apace, would your position be different if that were not part of the record? Your Honor, it is a different record, but I do think that Judge Keenan's view of EO2 still holds here with the proclamation. Even after the study? That's my question. Judge Keenan, it seems to me that the fact that the government has taken great pains to investigate what exactly are the threats that are posed, that it arguably can be illogical, it can be flawed, it can be a product that perhaps you wouldn't be proud of in terms of its cohesiveness, but the President can do it, can't he, if he makes the required findings, as long as it doesn't violate the INA or as long as it doesn't violate the Constitution. Aren't we now, since he's looked into the substance and reached his conclusions, limited to determining why this violates the INA or violates the Constitution? Your Honor, it does in fact violate both the INA and the Constitution for similar structural reasons that you pointed out in looking at EO2 and going back to Judge Harris's point. Are you limited to looking at just that? No, Your Honor, we're not limited because for the same reason that this Court held that we passed through the Mandel hurdle because the record shows that the proclamation, like EO2, is not bona fide, and I think that the internal illogic of the proclamation in being under-inclusive by not having a nationality ban against Venezuela, even though it met the baseline, and then including Somalia, even though it failed the baseline, not including countries like Belgium or the Philippines that have been widely known, as the national security officials have noted. But that goes to judgment rather than authority. But Your Honor, I think it's... Where is there a violation? I think you'd perhaps help us more if you could tell us why this is a violation of the INA. Yes, Your Honor. On the Establishment Clause, the proclamation suffers from the same fatal flaws that EO2 did. We get past the Mandel hurdle if the Court's going to continue to apply the Mandel test because on its face and taken in light of the statements the President made that he's sticking with his original purpose, to use nationality as a proxy for religion, we do not know that this proclamation on its face is not bona fide. There's also evidence in the proclamation itself, just limited to its four corners, that because of the internal illogic, again, being under-inclusive, being over-inclusive, letting in a great number of non-immigrants, even though the President is saying the whole premise of this is that the nation has some problem that makes the entry of anyone from that country a threat, all of those things show that on the four corners, this is not facially legitimate. But putting that aside, it's clear on the record that the President has continued to make statements of hostility toward Muslims and tellingly, in response to something the government said in its presentation, he said that the November 29th statement the President made, the retweeting of these anti-Muslim videos, is not connected to the proclamation. To the contrary, on the White House official website, you will find the statement of an official White House spokesperson, who said that security and public safety for the American people are the issues the President was raising with those tweets, and that the President has been talking about these security issues for years now, from the campaign trail to the White House. And the President has addressed these issues, again, the issues illustrated by the tweets, with the travel order he issued earlier this year and the companion proclamation. Counsel, let me ask you, let's assume the same principles that you've described in your briefing elsewhere, same record. But the proclamation only covered Syria. Is there any difference? Yeah, I think that it would still be a problem because the President and Vice President Pence, for that matter, even before the election, had targeted Syria in the same way and made the same connections between nationality and the important religion in the country. It's different from what President Reagan and President Carter did. It's different because it's the structure of the proclamation holds. It violates Congress's judgment in the 1965 act that we aren't going to act on stereotypes. We aren't going to go to a nationality-based quota system. Syria, for example, or Iran, if you want to stand at the two. Both countries, the only two on the list, that refuse any cooperation with the United States in terms of intelligence sharing, identity sharing for travel. They're chock-full of folks from al-Qaeda. They've been in varying states, at least in Syria, of civil war. Are you saying on this record that a president, any president, is simply not able to make judgments for the protection of the nation and the conduct of foreign policy? It's only those countries? Certainly not, Your Honor. And setting aside our statutory claim, you mean? On the establishment clause, certainly it would be a different record if the president hadn't continued to make statements, anti-Muslim statements, right up to the time he issued the proclamation. Your position is even if it's just Syria or Syria and Iran, because you're only two, there's no change in your order. On the same record, including the tweets and on the constitutional claim? Yes, Your Honor, I think that would still be a problem. Well, how do you explain the fact that Congress and the prior administration identified the very same countries, I think it was in the Visa Waiver Program, saying that they were a problem and they were not part of that program, and for the very same reasons. Those very same countries were the countries that were included in EO1 and EO2. And they are also, to some extent, to most extent, carried on into the proclamation in addition to Chad and Venezuela and North Korea. So you draw a lot of inference that EO1 identified all Muslim countries and, therefore, it was a surrogate for anti-Muslim animus, whereas those very same countries have been historically part of the administration's, prior administration's, identification of problems in the immigration area, simply for the very same reasons, the lack of information, the fact that there weren't good checks, it's hard to vet, and that many of these terrorist groups were springing up in those countries. And so I don't see the logic where you start with EO1 without looking even at the prior history. If you're going to look at the prior history, how we treat those countries as nationalities, then you have to go that far. And then, in addition, of course, Congress identified nations, not individuals, and you seem to suggest that Congress is prohibiting identification by nationality. But throughout the INA, they do so. Your Honor, Judge Niemeyer, that's precisely why we prevail on our statutory claims. Congress looked at the very factors that the President is asserting here as justifications for the proclamation. And their judgment was the answer to that problem is that if these countries propose these kinds of information-sharing problems, don't let them participate in the Visa Waiver Program. Subject their nationals to the individualized vetting process. But Congress also gave the President the right in the national interest to exclude nations, hold classes of immigrants under 1182F. But, Your Honor, that is really an exercise of sovereign power, which Congress shares with the President. But I don't see how we, as a court, ought to be asking the questions that we're asking today. Was the judgment's question right? Did he have enough information? Is he really protecting the national interest? If we screen a whole country which has numerous terrorist groups, do we have to just identify members of the groups who raise their hand and say, I'm a member? I mean, these are judgments of the executives exercising sovereign power vis-a-vis other countries. And they're not the subject of court review as we're seeming to want to conduct. And you seem to want to conduct. It seems to me if on its face is logic coherency, and there is, there's a selection among countries based on identified data that some Muslim countries are subject to the restrictions and some Muslim countries are not. Indonesia's not on there. I mean, and it's almost all Muslims, isn't it? And it's huge in terms of population. So the suggestion has a background noise that is driving your argument. And that background noise is the subjective views of the President expressed during the campaign. But, Your Honor, it's actually there are two points I'd make in response. In fact, though the President does have great power in matters of national security and immigration, he is subject to the constraints that Congress has put on him and that the Constitution puts on him. He gets his powers from the Constitution in the first instance. And he shares those powers with Congress. And the Supreme Court has made that explicit for 100 years. And Shaughnessy just represents that. The idea that we're interfering in the judgment of this proclamation, it seems to me all we need to do under Mandel is to look at the face of the proclamation and say whether it is rational and exercised in good faith. From the face, it says facially. And if so, that narrow exception that Mandel granted and Dinn granted, we're then left with a background where courts, we play an important role, but we play an important role domestically. We do not exercise the sovereign power of the United States vis-à-vis other countries and nationals in other countries. That's a presidential executive branch power and congressional. And Congress gave it, shared that power, and gave it to the president in full scope. And now you're saying, no, he doesn't have it. We get to review it. We get to ask him why. Remember in Shaughnessy, you can't ask the president the real reason. And they put real in quotes. Actually, Your Honor, in Shaughnessy, the Supreme Court reached the merits of the statutory claim. And it wasn't about the actions of the president. The Supreme Court has been very clear about exactly how the president and Congress share the power to regulate immigration. Congress writes the law, and the president must follow it. And in 1182-F, Congress did give the president a power to suspend for a period of time the entry of noncitizens. But he's subject to the restrictions that are both on the face of 1182-F, having to make the finding, as Chief Judge Gregory noted. And he's still subject to the Constitution. In Thale v. Haitian Centers Council, the Supreme Court reached and considered on the merits a claim, a statutory claim, about the president's action under 1182. It did not say that's nonreviewable. And contrary to what the government proposed during its argument, Thale actually just said that the president was acting pursuant to the powers he was granted by Congress. It sounds to me, in Thale, it did just the opposite of what you're saying. In Thale, the court basically said, that's the president's prerogative. And we're not going to review that. Actually, Your Honor, what Thale was about was whether the president was comporting with the statutes passed by Congress. And the court said, we construe the statute, then INA Section 243H, and the U.N. Protocol on Refugees to which the U.S. has signed. Let me ask you something, just actually along these lines, a little bit more particular. What is the right that your plaintiffs are exercising in coming to court? In other words, I understand you're relying on the APA. Is there anything else that you're relying on to get into court? On the statutory claim, Your Honor? Every claim. Sure. We're relying on the APA, Your Honor, but we're also relying primarily on the large number of cases, including Abu Rask, Lava. No, no. Tell me what is the substance. Is there a statute that authorizes you to come to court? Or are you looking for a freestanding constitutional claim? There is. The government doesn't contest that the court can review constitutional claims. You need to answer my question. I'm not worried about it. I'm answering it, Your Honor. In Chamber of Commerce v. Reich, Armstrong, and Danes and more, the Supreme Court made clear that courts have the authority in equity to enjoin an executive branch agency when there is a claim that is successful that the president or the executive branch is violating the law, whether that be statute or constitution. And we see in case after case that the circuit court and the Supreme Court I thought Armstrong suggested the injunction had to be connected to a cause of action. And I'm trying to figure out. It sounds to me like you're trying to file a Bivens type of action under the First Amendment, a freestanding claim that we're being discriminated against under McCreary. Under, not McCreary, under the Establishment Clause Jurisprudence. And I'm not sure there is such a claim. Your Honor, we're not making anything like a Bivens claim for damages here. No, I'm asking whether it's a freestanding constitutional claim. I'm not talking about Bivens. I'm talking about Bivens was created an exception because the plaintiffs didn't have a way in the court and the Supreme Court created that. But my question for you is there is no such cause of action that's been created for you in your circumstances, and I want to know what you're relying on. Your Honor, this court has already crossed that bridge in deciding on EO2. So we're stuck by it? That's right, Your Honor. Well, first of all, our decision on EO2 was vacated, you know. But the reasoning still applies. The majority's reasoning is correct. In case after case, the Supreme Court and the Federal Circuit Courts, including in cases challenging 1182-F policies, has reviewed those statutory claims. You agree 1182 doesn't give you a cause of action to enter court, does it? It also doesn't create judicial review of 1182. It doesn't need to. 1182 doesn't address causes of action. So you just come into court and say somebody violated 1182? Sounds to me like you're asserting a cause of action under 1182. Your Honor, the majority of the court was correct when it said that it's the core function of the court to decide. Well, you know, I disagreed with the majority, so I'm interested in knowing what your position is without relying on the majority. In other words, let's go to your position, not what the majority did. Your Honor, on the statutory claim under Chamber of Commerce v. Reich and Danes and Moore and countless other cases, it's clear that if there is a claim that the president is not following the statutes passed by Congress, courts can review that decision in equity. It has the equitable power to enjoin the president from violating a statute. It has a remedy, but it doesn't create a cause of action. And you don't have a cause of action under the INA. And the only place that you try to get a cause of action, apart from the INA, under the APA, which is pretty dicey, as you know, is some freestanding claim that what the president did is unconstitutional, therefore I can be in court. But that's not the way it works. Your Honor, the government doesn't even argue that there's no cause of action for a constitutional claim. Does that make a difference as to what we do? I mean, we have subject matter jurisdiction. We have a role in this system. And as you know, the branches, the three branches have their defined roles, and we're acting fairly aggressively in a role that's been conferred to Congress and the president and not to us. Your Honor, there's not a single case among the ones the government cited that actually stands for the principle that our claims, whether constitutional or statutory, are non-justiciable. Fialo, Knopf, and Shaughnessy. Fialo. And Fialo, Your Honor, all reached constitutional and or statutory claims relating to the president's power in exactly these kinds of circumstances. They basically reached the conclusion that you don't have these causes of action. Your Honor, they reached the conclusion. And I can tell you in this case, the Supreme Court's going to address it, and they're going to tell you one way or the other whether you have it, too. But the fact that they address it doesn't mean you have a cause of action if they're going to tell you you don't have a cause of action. In other words, courts do have a right to decide their own jurisdiction, but they don't have a right to go beyond it if they don't have jurisdiction. And, Your Honor, on the statutory claim, the Ninth Circuit as well has ruled that there is a cause of action under the APA and in equity. Let me ask you about the statutory claim again. Is it your position that there are no findings in the body or on the basis of this proclamation that satisfy 1182F or that whatever findings appear in the body of that document simply misalign and are insufficient to satisfy the requirements of the statute? Which one is it? I think it's both, Your Honor. The President does invoke magic words that he makes the finding that the entry of these 150 million people who are mostly Muslims would be detrimental to the interest of the United States. But if you look at his actual findings, for example, Your Honor, in Section 1H, I beg your pardon, 1I, sorry, 1H Roman I, he says the restrictions and limitations imposed by this proclamation are, in my judgment, necessary to prevent the entry of those foreign nationals about whom the United States government lacks sufficient information to assess the risks they pose to the United States. Well, that is just a basis for someone being excluded from the United States under 1182A. Congress has already decided what to do about that. And so there's one critical finding that's missing from this proclamation and setting aside whether it would be a sufficient one. The President basically said that the comprehensive and detailed system for admission of noncitizens to the United States with individualized vetting and the Visa Waiver Program for nationals of those countries is sufficient out to these six countries. I'm going to beginning of the proclamation. It says, I hereby find that absent the measure set forth in this proclamation, the immigrant and nonimmigrant entry into the United States of persons described in Section 2 of this proclamation would be detrimental to the interests of the United States. Yes, Your Honor, those were the magic words. And that their entry should be subject to certain restrictions, limitations, and exceptions. Are those the magic words you were talking about? Yes, Judge Gregory. The President invoked the magic words, but the point I'm making is that it's internally illogical because the further detail he gives elsewhere in the proclamation shows that he didn't actually apply the baseline factors because he included Somalia when it passed the baseline. He didn't make a nationality ban against Venezuela. He only applied that to government officials, certain government officials, even though they failed the baseline. And he's letting in a lot of people from these countries, even though the whole justification is you can't trust anyone coming from these countries. And, Your Honor, the proclamation is different from the Iran and Cuba examples the government discussed. We believe that nationality discrimination is prohibited under 1152A, but set that aside. Even if you think there are some instances in which a nationality-based ban is permissible. The President has written a 10-page proclamation with detailed subsections, completely unlike the few lines that the President used to justify Iran in President Carter's instance, or Cuba in the individual case. He penalized him for being thorough? I mean, I'm not sure I understand that. Your Honor, what he can't do under 1182F is to rewrite the laws passed by Congress. And what the proclamation represents is a rewriting of 1182A, the grounds for inadmissibility, and all of the other sections of the INA that provide for individualized vetting of visa applicants. Congress has said, as Judge Niemeyer pointed out, they have looked at the very factors that the President looked at here. And they came up with a solution, which is they rejected in 2015, they considered the same country in the day of Congress. Yes, Your Honor. That Congress in 2015 looked at the same problems the President is asserting here as to the same country, as Judge Niemeyer pointed out, and they rejected the idea of a country-based ban on admission. Instead, they said, we're going to stick with our individualized vetting, and we're going to go after the people who not are nationals of these countries, but if you've traveled in these countries, if you are dual national, so you're holding a U.K. passport, but also have an Iranian passport, you go through regular vetting. We're not going to subject you to a country that we would. That's right, Your Honor. What about the President's assertion that this is intended to be sort of a cudgel or a bargaining chip to promote or incentivize these nations to cooperate? Your Honor, the best answer to that problem is what he did with Venezuela. If you have recalcitrant governments or governments who are doing a bunch but aren't up to snuff, you can do two things. You can do a Venezuela-type ban, which has a lot of precedent among the past proclamations, where you say, look, these government officials are recalcitrant. They're not cooperating with the United States on information sharing, so I'm going to bar you and your family members from coming in. That's not a nationality ban, and I think that is permissible under 1182-F. You can also do what Congress recommended in the INA, which is to give assistance to the countries that are having trouble, like Somalia. And that's the answer. And I have to point out the internal logic. Well, Your Honor, you preclude the President from even banning nationals in a state of war. Your Honor, I think a state of war is different, and there's different statutory frameworks that would apply in that situation. Why is there a different framework? I don't read any of this stuff. I don't read any of these reasons you're giving. You're sort of saying the President can exercise legitimate foreign policy if he does this, but he can't exercise legitimate policy if he does this. If he treats the nationals just in the top government, it's okay. But if he treats the whole country because the country's antagonistic, it's not okay. In other words, you are making judgments about foreign policy, which you personally are making for some other ulterior purpose. Your Honor, respectfully, I'm not making those limitations. Are you making these arguments? Your Honor, I'm pointing to Congress's limitations. Duly enacted statutes passed by Congress that limit the President's authority. Well, then you're not recognizing that while 1182A provides criteria for admissibility, so does 1182F. And in 1182F, they said the President himself has broad discretion, and we're going to give him discretion to act as our representative for the sovereignty of the nation, not as a domestic matter. Subject to the requirement that he make a finding, which is reviewable by the federal courts. Where did you get that, which is reviewable? Where do we get the right to review the President's foreign policy decision? Your Honor, the government's relying on a number of consular non-reviewability cases. No, I'm talking about, I'm asking you, where are you getting the authority to state that 1182 is subject to review by judicial, by courts? The Supreme Court has said so in Sale v. Haitian Centers Council, among other cases. Well, we read it differently. Well, the Supreme Court did that there. I'm not sure it said that. Well, it was argued that there was no jurisdiction for various reasons, and they went ahead and decided it was on the merits. But I'm not sure there was a decision on that. Would you agree with that? Your Honor, I don't think that Sale addresses a specific justiciability question, but one hopes the Supreme Court wouldn't have decided a case that it argued have, where there was no possibility. I'm having trouble understanding your statutory argument. And I guess the complaints you have about it, it seems to me, I agree with my colleague, which it doesn't sound like we can really say to the President of the United States, well, you're illogical here. You don't follow the procedure here. Do you, is your argument really basically a structural argument? Is that what you're saying, that Congress set out a procedure, and it's because you haven't complied with that procedure, Mr. President, that, is that what you're saying? Your Honor, I'm not understanding. I think there are two main arguments we're making. The first is that the President, as to 1182-S, has not made the requisite finding that this is detrimental to the United States. Because of the internal logic, yes. Secondly, Your Honor, what 1182-S can't possibly permit is the President to contravene, to rewrite, large sections of the INA. And that is your structural argument. That's our structural argument on 1182-S. The other statutory argument we're making, of course, is that 1152-A and the 65 Act's overall purpose of moving, rejecting the past historical practice of the United States to have national origins quotas, which went back to the 1924 Act. That was a categorical decision as part of other civil rights, comprehensive civil rights reform. Your Honor, your explanation is accurate. Under your theory of the case, tell us why President Reagan's proclamation of President Carter's would have been valid. Because they were clearly nationality bans. They were indefinite. What's the difference between those and this one? So, Your Honor, first, no one challenged those two. Well, we don't know. What I'm asking you is, were they valid? I don't think any nationality bans are valid, but you don't have to buy that in order to accept our statutory argument. Because, Your Honor, the distinction is that with Iran and Cuba, the Presidents were acting in response to urgent circumstances with a bilateral crisis. But that's not in any of the statutes. That's not in any of the cases. That's just something that the district court and you have put forward. But that's not part of the law. Well, the law says very clearly no nationality discrimination. So I'm just trying to explain why you can read the Iran and Cuba bans. Your case doesn't rise and fall on this, but it just seems like to me that the logic of your position is that President Reagan and President Carter's proclamations would have to have been invalid under your statutory argument. There's a way to read them in harmony, Your Honor. I actually do believe that 1152A and in general the 65 Act prohibits nationality discrimination. But you don't need to agree. Because if there is an exception to 1152A, it can't be that the President can disagree with Congress's considered judgment about the same problems with the same countries and then rewrite that. If Congress made the considered judgment in 1152A to where their nationality is just simply off the table with respect to any action with respect to visa issuance, then it just seems like you have to say that President Reagan and President Carter violated the statute when they issued those proclamations. Your Honor, I think they did. But, again, you don't have to agree with me in order to agree with my 1152A argument. And the reason is that the Iran and Cuba situation, again, if you look at the text of those proclamations, they were just a few lines. Congress had not considered those specific situations, and the President said these are evident circumstances. I have to deal with this diplomatic crisis, and I'm going to suspend the entry of these. So if the President, in this case, ended his proclamation at the end of that first paragraph, you'd be all set. You'd agree with it? If he just said we're going to do a worldwide review of countries? No, no. No, he just ends and he said we're going to... No, Your Honor, because I think the scope also matters. We've got a hundred...one question, Your Honor, is, is the President trying to return to the national quota, national origins quota system that Congress categorically rejected, as President Johnson said... He's not even addressing visas. He's addressing the admissibility under 1182 and relying on that power, and he's distinguishing among Muslim countries. He is identifying criteria that distinguishes them. The fact that they can't get information about persons, the fact that they don't follow procedures, the fact that many of the groups there, they're not suppressing these groups. These distinguish these particular Muslim countries, they're not all Muslim, but the ones that are included here, from other Muslim countries, which were considered and not included. So, I don't see the logic of where necessarily follows that says he is now banning them because they're Muslim countries, which are Muslim, as opposed to some other criteria that he identifies in the proclamation. We know that, Judge Meemeyer, because the President has said so, that he was going back to his original plan and going all the way. And I'd note that even though he hasn't banned other Muslim countries, in Section 4C of the proclamation, he didn't... Of course, the whole purpose... The purpose of EO1 and EO2 was to set up a system to collect data, and he built on prior countries that were suspect in that. As a matter of fact, every one of the countries was included in prior congressional findings, except for Iraq, and he treated those, and it was a 90-day data collection period. The proclamation is the product of an analysis which does distinguish between countries and does apply criteria that are in the national interest. And your suggestion that he's just using the magic words and is not expressing the national interest is very strange, I must say. You said if it weren't for his statements made during the campaign and otherwise, it would be fine. No, I said it would be a different case, Your Honor. How about if another candidate won the presidential election and entered this proclamation? You wouldn't even be here. That's not true, Your Honor. If that candidate made these same statements... Well, your colleague at the last hearing conceded that you wouldn't be here. Your Honor, I think the point that we were making is that if you didn't have a record of statements, it would be a different case. You didn't say that. You conceded EO2 in the last hearing. You conceded EO2 was neutral on its face, and that we would not be here if we didn't have the presidential statements. And so now you're backing off that and basically saying it would be a different case. Well, sure, it would be a different case. You just wouldn't be here. Your Honor, actually, we pointed out the deficiencies within the four corners of EO2 that Judge Keenan picked up on in her conferring opinion. So now we get the right to review the internal proclamation to see whether he's made good judgments. Your Honor, we're not relying on the report. I think that the government has waffled on whether they're relying on the report. Now, if they're making it clear that they're not relying on the report, the court may not go into it. Let me ask a question with regard to something Mr. Moopin alluded to, Ms. Wayne. He alluded to the fact that the Morales-Santana case, wherein the majority of the Supreme Court described the standing from Fialo v. Bale as a rational basis for review. How does that impact our prior read of Justice Kennedy's concurrence in the Kerr v. Dem case? Your Honor, I think that the court already addressed that in a previous opinion. But the argument, basically, that Fialo didn't involve any allegation that the government was acting without a bona fide reason. There wasn't any allegation of bad faith. And Morales-Santana was citing to Fialo, where that wasn't even an issue. And it can't be that where you have a record showing that the President's action is neither facially legitimate nor bona fide, that you don't simply follow Mandel. Mandel is not a rational basis test on its face. It's to ask the court to determine, is the President's action facially legitimate and bona fide? And that's exactly what Justice Kennedy did in Kerr v. Dem. He simply said, look, in that case in Kerr v. Dem, they didn't get past the Mandel hurdle. But this court made the correct call on that question in reviewing EO2. None of that has changed with the proclamation. So, can I just ask you about the Establishment Clause case, just for a minute? It's pretty clear from them that the Supreme Court tells us that once you violate the Establishment Clause, you haven't violated it forevermore, right? We haven't violated it yet. And so, in this instance, how does the taint? We have these pre-election statements, we have the post-election statements, the pre-EO2 statements, all of the pre-EO2. We don't have so many statements. Why is the taint, or does the taint, what's your best argument for why the taint from the prior statement still exists here, or still covers this case? Or maybe you don't make an argument about that. We certainly are, Your Honor. The taint has not dissipated. We agree, of course, that under McCreary, the taint doesn't last forever. But here, once again, what you have is the President sticking with his original plan. Those are his very words. He's going back and going all the way. Second, Your Honor, on March 15th, as soon as EO2 had been joined by the District Court, he said that. He continued to make statements hostile toward his lawn, including the August 17th, the apocryphal Persian story that Judge Thackeray mentioned, and the three tweets just last week that the President then tied to the proclamation and the new ban. And finally, Your Honor, the President once again speaks in vague words of national security, but again has continued not only not to repudiate his previous statements of hostility toward Islam and Muslims, he has also doubled down, in this case tripled down, on those hostile statements. Again, on March 15th, he said assimilation of Muslims in the United States has been very, very hard. August 17th, he has a purging story. November 29th, he retweets three videos that are anti-Muslims. And, Your Honor, on that record, you simply have on the proclamation a litigation position, like we saw in McCreary, which is not sufficient. And the President has doubled down on all of his statements. If the government is right about justiciability and about the scope of presidential power, then the President could promise a ban on Muslims throughout his campaign, then declare, I'm carrying out my campaign promise by using nationality as a proxy for religion, ban 150 million people who are almost all Muslims. Let me follow up on Judge March's question, at least. That's just a focal question. What would be the standard that he would use in this instance where there has been an attempt to determine whether or not the government has in fact hewed this so-called unconstitutional action under the Establishment Clause? What's the standard? I think the standard is the same through line in all of the Establishment Clauses, Your Honor. And then the test doesn't change. And that's common in McCreary, Santa Fe, Curious, Joel, Larson, and one of the most recent opinions in Lund. And that is, is the primary purpose here, the manifest objective, to disfavor one religion? That's the test. And the record on that has not changed. In fact, it's been augmented. What about the fact that the government says, well, we disagree that these statements are just anonymous. But even if you take that at face value and understanding Judge Harris's questions that were dealing with the unitary executive, they point to the President's subordinates and say, well, you haven't questioned their motives. And they conducted this review, and on the face of it arrived at this result, which, but for the statement, would, as you can see, be a much more difficult case. Does that change the result? Your Honor, actually, we do. There is in the record evidence that at least two of the officials, lower level officials, involved in the President's study also have made anti-Muslim statements. We have that in our motion for judicial notice. But, Your Honor, our argument is not that every lower level official involved in the President's study acted out of a personal anti-Muslim hostility. It's that the President was acting out of a purpose to disfavor Islam, and he directed his lower level officials to carry out his original purpose in the original way he meant to do it, which was by using nationality as a proxy for religion. I asked this question last time. If he's so intent, and I asked about if people looked at all of his statements, and if people looked at all of his statements and took that he was doing other than being completely anti-Muslim, how would you deal with that? But if your position is he absolutely is anti-Muslim and everything he's doing is that result, and he's banning 150 million people, most of whom are Muslim, his ban doesn't affect 90% of Muslims in the world, does it? But, Your Honor, that doesn't matter. But I'm asking you. Well, he could add more countries under Section 4C of his proclamation. But what matters, Your Honor, is that he has banned 100… He just didn't know how to write a ban. He's not smart enough to figure out how to ban all Muslims. Your Honor, if his purpose is to disfavor Islam, he need not ban every single Muslim. I know that, but I've heard the number 150 million, but there's over a billion Muslims who aren't affected by this ban. But, Your Honor, if you take the face of the order, he's continued to ban these six predominantly Muslim countries. Taken together, they're over 95% Muslim and affected 150 million people. And the government makes much of the fact that he's thrown in two non-Muslim countries for good measure, but one of them, Venezuela, is not a nationality ban. It's a very targeted ban. And the other one affects less than 100 people. Let me ask you this. The court below applied, I'm not saying it's correct, but it applied kind of a least restrictive analysis. And it said that the government hasn't shown that the national security interest couldn't be addressed without this ban. And what alternative, as far as addressing this national security interest, would you find acceptable? Your Honor, there is the Venezuela-type ban, for one thing, to address the problem that the President is asserting about governments that are non-cooperative. And the answer on the national security front is the one that Congress has enacted and stuck with in 2015, which is our individualized visa vetting process. But this E03 has a case-by-case waiver provision, doesn't it? And substitutes the President's criteria for that waiver process for the one instituted by Congress. But it does have an individualized basis. You can apply, any individual can apply for a waiver under this plan. There is a waiver that's available, Your Honor, but on the establishment clause. No, no, no, for individuals to seek to use. Which is also inconsistent with the system that Congress enacted, Judge Shedd. How important is it to your statute for the argument, the fact that it stands as indefinite? Is that a crucial distinction or simply one of several? Your Honor, I think that is a very important consideration in a couple of different ways. One is that the President, the government came in on E02 and said, oh, the reason that this ban is okay is because it's a temporary 90-day pause. The President has repeatedly said since March 15th when E02 was enjoined, I'm going to get even tougher and go back to my original plan. Right, but that was when we kept pressing Mr. Wald and kept saying, you haven't made any substantive findings, you've just made a conclusion. So we've got a little bit of a different situation now. Sure, it's also relevant under 1182F on its very terms, as I think Your Honor noted in talking with the government. The statute speaks in terms of suspending for a period of time. What I'm trying to get at, if it were temporary rather than indefinite, would that make a difference in the ultimate outcome of the case in your view? No, Your Honor, I don't think, even if it were temporary, I think we still prevail on our statutory claim and on the constitutional claim, of course. But it does show, the fact that it is now indefinite and potentially permanent with new countries potentially being added, does distinguish this proclamation from every prior proclamation under 1182. Nothing else any President has ever done looks like this. Well, I thought this had the reasons for the restrictions and then had periodic reviews of the restrictions. What do you think that's included for? Your Honor, those periodic reviews we have to assume will follow the same format as the original. I understand. Let's assume it follows the same format. But don't you think that if a review turns up that the restrictions are no longer needed, the implication is that the restrictions will be lifted? Well, it's possible, Your Honor. But the President's criteria, because he doesn't apply his stated criteria consistently, we actually, it's a black box. We don't know what the, we don't know why. Well, all foreign policy is a black box, and it should be. That's what we have committed to the Department of State and the Secretary of Defense and the President. Except, Your Honor, that the government's relying on that black box. And if the question is, does the study cure the taint, the answer has to be no. They don't even address the taint because they don't acknowledge the taint. They are saying that these proclamations are issued in the interest of national security in order to identify persons who can challenge the safety of the country if they came into this country. And it's a difficult problem that's been experienced by many countries with all the disturbances in the Near East. And so the question is, is that illogical or is that irrational? And if those conditions no longer exist, there's no need for the proclamation. You have to assume on the face of the proclamation that with those periodic reviews, the purpose is to see if the restrictions are still needed. But, Your Honor, those periodic reviews are still part of the President's original method, which was to use nationality as a proxy for religion. And there's nothing on the record that undercuts that original purpose. He has said himself, starting March 15th and continuously through the summer and the issuance of DO3 proclamations that he's sticking with that purpose. Finally, Your Honor, I just want to add that if the government is right that this is non-reviewable, if the government is right that this is the scope of presidential power, then in the prescient words of Justice Jackson, this ruling would lie about like a loaded weapon. And it's telling that the President, while campaigning, explicitly referred to the Japanese-American internment as a precedent for this ban. That's contrary to the laws passed by Congress. It's contrary to the Establishment Clause. And it's contrary to the basic structure of government and the Constitution. Thank you, Counsel. Thank you. Mr. Moopitt, you have five minutes reserved. Reserved, David. He does. He does. He gets his time. Four points, Your Honor. The first is, last time we were here, both judges on this court and other courts faulted the government for not having findings to justify the prior entry suspension and faulted the government for doing an interim entry suspension before those findings were made. Well, now the government has made those findings. And Counsel is right. This proclamation is not like any of the other ATF proclamations that have ever come before us. But that's because no other proclamation has ever had this sort of detailed level of investigation and review and findings. The findings here dwarfed what presidents before have done to justify the entry restrictions they have imposed. And as the district court recognized correctly in this instance, what they are actually asking for is just a second guess to the president's policy judgment. And nothing in 1182 has authorized that sort of second guess. They, for example, say that it's illogical and it's inconsistent. A, it's not true. And B, it's not authorized to engage in that sort of second guessing. Their primary point that they keep emphasizing is that there are exemptions. Well, no law pursues its purposes at all costs. All laws recognize that there are competing considerations. And in this circumstance, it makes particular sense that what they're trying to do is encourage foreign governments to change their behavior and tailor that based on what the foreign government is. They also emphasize that this goes above and beyond the visa ban. Well, in this, first of all, 1182 has always been recognized to go above and beyond the 1182 restrictions. That's what the D.C. Circuit recognized. In the Havarest, that's what the First Circuit recognized in INA. And they didn't respond to that. And here, it makes perfect sense. They say that what should happen is consular officers should deny visas if they don't have enough information. But the whole point, the whole problem here, is that we've determined that foreign governments aren't giving us enough information. In fact, the circumstance, it doesn't make sense to run through the visa banning program when the defect is that the visa banning program is being undermined. There's a systematic problem, and so therefore, it's best to engage in a systematic solution. The main purpose is to influence these countries' internal policies, correct, about information sharing? It's a dual purpose, Your Honor. It's because there are inadequate information sharing practices, we both want to encourage them to change their behavior and protect this nation until they do. Absolutely. But the main thing is you want to encourage them to change. And to ask the North Korea, would you say North Korea has the greatest amount of exemptions in terms of people affected by this ban? There are no exemptions for North Korea. It's a complete ban on both immigrants and non-immigrants. So the greatest influence that we want to have on North Korea is that we don't let their citizens come in, right? Your Honor, with respect to the information sharing – I'm just trying to say that because they have the most restrictions, correct? Yes, they are among the most recalcitrant countries with respect to information sharing. The greatest amounts of restrictions were imposed on them. Countries that cooperated more with the government, lesser restrictions were imposed on them. But countries like North Korea and Syria that cooperate least had the greatest restrictions imposed on them. And the last point I'd like to make on the statutory section is on the question of whether it's indefinite, Judge Kuhn. Given that the finding is that there's an inadequate, it would make very little sense to have it be indefinite restriction. Foreign governments don't get to run out the clock on not providing us the information we need. But what we have done is made it a periodic review such that if they do improve, that can be revisited. Well, it could be a sunset provision, though, subject to renewal. Well, but again, a sunset provision doesn't make sense when there's an actual identified problem. And we have an indefinite – every 180 days under the proclamation, it will be revisited. And I believe Judge Hawkins pointed out in the Ninth Circuit, 42 out of 43 past the executive order don't even have that. They are just straight up indefinite. And that's totally consistent with the language of the statute, which is, for such period as the president may determine. The second point I'd like to make is on 1152, a nationality restriction. The point in that statute that legislative history makes clear was the one about the national origins quota. But it was not to restrict the ability of the president to make determinations about national security problems that made people ineligible to enter in the first place. And that is the solution, and that is the explanation for why the Cuban order wasn't invalid and why the Iranian order wasn't invalid. It was quite sort of a nationality restriction. And it's not that there's some made-up emergency exception in the statute. It's that the statute is about issuing immigrant visas. It's not about people who aren't eligible to enter the country in the first place. But even if you thought there was some sort of made-up emergency exception, this proclamation should satisfy it just as much as, for example, the Cuban proclamation. The Cuban proclamation involved a diplomatic dispute from a brief that was 15 months earlier. Here the agencies have recommended to the president that there are identified defects in information sharing today. And in response to that, the president has asked, this is far easier to justify than the Cuban proclamation, even on their own rationale. Thank you, counsel. Yes, you have two minutes. Thank you, Your Honor. My rebuttal time is limited to our cross-appeal, so I'll just say very briefly that we are cross-appealing because permitting any part of this third version of the ban to go into effect violates the First Amendment's core requirements, the government not saying allow one religion or disfavor. That problem is heightened because it's no longer a pause but an indefinite ban with possibly even more Muslim countries to be added. In Lund, this court pointed out that the great promise of the establishment clause is that religion will not operate as the instrument of division in our country. That's exactly what the proclamation does, and the court should not countenance that. Thank you, Your Honor. Thank you. We'll ask the clerk to adjourn the court for the term, and they will come down in Greek countenance. We rise in the name of Jesus. We rise before the name of Jesus, the name of God. God save the United States and His Honorable Court.
judges: Roger L. Gregory, Paul V. Niemeyer, Diana Gribbon Motz, William B. Traxler Jr., Robert B. King, Dennis W. Shedd, G. Steven Agee, Barbara Milano Keenan, James A. Wynn Jr., Albert Diaz, Henry F. Floyd, Stephanie D. Thacker, Pamela A. Harris